IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHAQUAN COTTON )<br>1228 Deer Harbor Dr. )<br>Garner NC 27529 )<br>        Plaintiff, )<br>)<br>    v. )<br>)<br>CCH HEALTHCARE NC, LLC D/B/A )<br>CARVER REHABILITATION & LIVING )<br>CENTER )<br>303 E Carver St. )<br>Durham, NC 27704 )<br>)<br>)<br>    **Serve also:** )<br>    CCH HEALTHCARE NC, LLC D/BA )<br>    CARVER REHABILITATION & )<br>    LIVING CENTER )<br>    338 Whitesville Road )<br>    Building 5, Suite 501 )<br>    Jackson, NJ 08527 )<br>)<br>    -and- )<br>)<br>    CCH HEALTHCARE NC, LLC D/BA )<br>    CARVER REHABILITATION & )<br>    LIVING CENTER )<br>    C/O CT CORPORATION SYSTEM )<br>    160 Mine Lake Ct. )<br>    Ste 200 )<br>    Raleigh, NC 27615-6417 )<br>)<br>        Defendant. ) | **COMPLAINT FOR DAMAGES AND REINSTATEMENT**<br><br>**JURY DEMAND ENDORSED HEREIN** |

Plaintiff, Shaquan Cotton, by and through undersigned counsel, as her Complaint against Defendant CCH Healthcare NC, LLC d/b/a Carver Rehabilitation & Living Center, states and avers the following:

## PARTIES

1. Cotton is a resident of the city of Garner, county of Wake, state of North Carolina.

2. CCH Healthcare NC, LLC d/b/a Carver Rehabilitation & Living Center ("Defendant" or "Carver") is a domestic limited liability company that operates a place of business located at 303 E Carver St, Durham, NC 27704.

3. Carver was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. 2000e-2 et seq.

4. Carver was at all times hereinafter mentioned, a "person" within the meaning of 29 USC § 203(a).

## JURISDICTION & VENUE

5. Carver hires citizens of the state of North Carolina, contracts with companies in Ohio, and owns or rents property in North Carolina. As such, the exercise of personal jurisdiction over Carver comports with due process.

6. This cause of action arose from or relates to the contracts of Carver with North Carolina residents, thereby conferring specific jurisdiction over Carver.

7. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1341 inasmuch the matters in controversy are brought pursuant to Civil Rights Act of 1964, 42 U.S.C. 2000e-2.

8. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Cotton's state law claims because those claims derive from a common nucleus of operative facts.

9. Venue is proper in this District because the wrongs herein alleged occurred in this District.

10. Within 180 days of the conduct alleged below, Cotton filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 433-2024-03077 against Carver operating at 303 E Carver St, Durham, NC 27704.

11. On or about June 20, 2025 the EEOC issued and mailed a Notice of Right to Sue letter to Cotton regarding the Charges of Discrimination brought by Cotton against Carver in EEOC Agency Charge No. 433-2024-03077.

12. Cotton received her Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1) - which has been attached hereto as Plaintiff's Exhibit A.

13. Cotton has filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

14. Cotton has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

15. Cotton is a former employee of Carver.

16. Cotton is African American.

17. Cotton was employed by Carver as an External Marketing Director.

18. Cotton began working for Carver on or about January 8, 2024.

19. Carver hired Cotton because of Cotton's skills and experience.

20. Cotton was qualified for her position as an External Marketing Director.

21. Cotton was qualified for her position as an External Marketing Director as a result of Cotton's skills and experience.

22. Cotton continued to be qualified for her position as a result of her skills and experience.

23. Cotton continued to be qualified for her position by meeting Carver's legitimate business expectations.

24. Cotton continued to meet Carver's legitimate business expectations by performing her job well.

25. Cotton continued to meet Carver's legitimate business expectations at all points referenced herein.

26. Throughout Cotton's employment, Carver treated Cotton differently than her Caucasian peers.

27. During Cotton's employment, Cotton was supervised by Kyle Ring.

28. Ring is Caucasian.

29. Ring was a Regional Director for Carver.

30. Ring had the authority to hire, fire, or discipline Cotton.

31. Ring held himself out as having the authority to hire, fire, or discipline Cotton.

32. Ring treated Cotton differently on the basis of Cotton's race.

33. In particular, Ring continually spoke to Cotton in a belittling and condescending tone.

34. Ring did not speak to Caucasian co-workers of Cotton in a belittling and condescending tone.

35. Ring did not speak to Debrah McAlexander in a belittling and condescending tone.

36. McAlexander is Caucasian.

37. McAlexander was an External Marketing Director for Carver.

38. Ring spoke to Cotton in a belittling and condescending tone on the basis of Cotton's race.

39. Cotton was disciplined on or about March 4, 2024. ("Carver's March 4 Discipline")

40. Carver's March 4 Discipline was unequally applied to Cotton.

41. Carver's March 4 Discipline was for shared duties with McAlexander.

42. McAlexander was not disciplined in relation to Carver's March 4 Discipline.

43. McAlexander and Cotton were equally responsible for the underlying events for Carver's March 4 Discipline.

44. Carver disciplined Cotton on the basis of her race.

45. On or about March 27, 2023, Ring used hand sanitizer after coming into contact with Cotton.

4

Case 1:25-cv-00852    Document 1    Filed 09/17/25    Page 4 of 16

46. Ring was not dirty.

47. Ring previously had the opportunity to use hand sanitizer before touching Cotton.

48. Ring did not previously use the opportunity to use hand sanitizer before touching Cotton.

49. Immediately after coming into contact with Cotton, Ring rushed to use hand sanitizer.

50. Cotton was not dirty.

51. Ring did not have a procedural reason to use hand sanitizer under Carver's policies.

52. Ring did not use hand sanitizer without any other reason after coming into contact with Caucasian employees.

53. Ring did not use hand sanitizer after without any other reason when coming into contact with McAlexander.

54. Ring used hand sanitizer after coming into contact with Cotton because of Cotton's race.

55. Cotton also suffered discrimination from Kevin Burch.

56. Burch is Caucasain.

57. Burch is the Administrator for Carver.

58. Burch was Cotton's direct supervisor.

59. Burch had the authority to hire, fire, or discipline employees.

60. Burch called Cotton a "monkey."

61. Burch referred to all African American employees at Carver as "monkeys."

62. Referring to an African American person as a "monkey" is a racial epithet.

63. Burch did not call Caucasian employees "monkey."

64. Burch did not call McAlexander "monkey."

65. Burch called Cotton "monkey" on the basis of her race.

66. Ring ratified Burch calling Cotton "monkey."

67. Ring laughed when Burch called Cotton "monkey."
68. Cotton found being called "monkey" offensive.
69. A reasonable person would find being called "monkey" offensive.
70. Being called "monkey" had the purpose and/or effect of unreasonably interfering with Cotton's job duties and created an intimidating, hostile, and offensive working environment. See 29 C.F.R. § 1604.11(a)(3).
71. Carver knew or should have known of Ring and Burch's harassment of Cotton.
72. Carver condoned, tolerated, and ratified Ring and Burch's harassment of Cotton.
73. A reasonable person would find being called "monkey" to be severe.
74. Cotton found being called "monkey" to be severe.
75. A reasonable person would find being called "monkey" hostile and/or abusive.
76. Cotton found being called "monkey" hostile and/or abusive.
77. Cotton immediately confronted Burch about the monkey comment, stating that it was racist and derogatory.
78. Burch did not respond to Cotton's comment except to laugh.
79. In or around February 2024, approximately two days after the monkey comment, Burch called Cotton into the office.
80. In the meeting with Burch, Burch terminated Cotton's employment.
81. Burch did not provide a reason for terminating Cotton's employment.
82. Burch terminated Cotton's employment for opposing discrimination for the monkey comment.
83. After Burch terminated Cotton's employment, Cotton reached out to Carver's Human Resources.
84. Cotton spoke to Mark Zaks.

85. Zaks is Jewish.

86. Zaks was a Human Resources representative for Carver.

87. Zaks reinstated Cotton's employment.

88. Zaks terminated Burch.

89. Burch was eventually replaced as Administrator.

90. Burch was replaced by Allyn Simmons.

91. Simmons is African American.

92. Simmons worked as an Administrator for Carver.

93. On or about March 1, 2024, Cotton reported discrimination. ("First Report of Discrimination").

94. Cotton's First Report of Discrimination reported discrimination on the basis of race.

95. Cotton's First Report of Discrimination reported disparate pay between McAlexander and Cotton of $7,000 per year.

96. Cotton's First Report of Discrimination was made to Simmons.

97. Cotton's First Report of Discrimination was made to Simmons orally.

98. Immediately following Cotton's First Report of Discrimination, Ring and Alyssa Last Name Unknown ("LNU") went to Simmons with a pre-typed Personnel Improvement Plan ("PIP") for Simmons to sign.

99. Alyssa LNU was the Director of Business Development and Operations.

100. Alyssa LNU is Caucasian.

101. Alyssa LNU had the authority to hire, fire, or discipline employees.

102. Alyssa LNU had the authority to discipline Cotton.

103. Alyssa LNU and Ring did not go to Simmons with a PIP for Simmons to sign for Caucasian employees.

104. Alyssa LNU and Ring went to Simmons with a PIP for Simmons to sign because of Cotton's race.

105. Alyssa LNU and Ring went to Simmons with a PIP for Simmons to sign in retaliation for Cotton's First Report of Discrimination.

106. Carver has a progressive disciplinary system.

107. Carver's progressive disciplinary system starts with a verbal warning.

108. The next level of discipline in Carver's progressive disciplinary system is a written warning.

109. The next level of discipline in Carver's progressive disciplinary system is a PIP.

110. The next level of discipline in Carver's progressive disciplinary system is termination.

111. Carver did not issue Cotton a verbal warning.

112. Carver did not issue Cotton a written warning.

113. Carver skipped levels of its progressive disciplinary policy.

114. Carver did not skip levels of its progressive disciplinary policy to discipline McAlexander.

115. Attempting to place Cotton on a PIP is an adverse employment action.

116. Attempting to place Cotton on a PIP is an adverse action.

117. Ring knowingly attempted to place Cotton on a PIP.

118. Ring intentionally attempted to place Cotton on a PIP.

119. Ring willfully attempted to place Cotton on a PIP.

120. Carver knowingly took an adverse employment action against Cotton.

121. Carver intentionally took an adverse employment action against Cotton.

122. Carver willfully took an adverse employment action against Cotton.

123. Carver knowingly took an adverse action against Cotton.

124. Carver intentionally took an adverse action against Cotton.

125. Carver willfully took an adverse action against Cotton.

126. Attempted to place an employee on a PIP would discourage a reasonable employee from reporting discrimination.

127. Carver attempting to skip levels of its progressive disciplinary policy on the basis of Carver's race.

128. Carver attempted to skip levels of its progressive disciplinary policy in retaliation for Cotton's First Report of Discrimination.

129. After Ring put Cotton on the PIP, Simmons discussed Cotton's PIP with Carver's CEO.

130. Carver's CEO is Jacob Stern.

131. Stern is Caucasian.

132. Stern had the authority to hire, fire, or discipline employees.

133. Stern had the authority to hire, fire, or discipline Cotton.

134. Simmons also informed Stern about Cotton's First Report of Discrimination.

135. Stern informed Simmons that Cotton should have been issued a verbal warning first if Cotton's performance had been defective.

136. Cotton's performance had not been defective.

137. Cotton had been performing over half of her office's work to excellent standards.

138. Simmons raised Cotton's excellent performance to Stern.

139. Stern disregarded Cotton's excellent performance.

140. Stern did not take further action regarding Cotton's First Report of Discrimination.

141. After Stern failed to take action regarding Cotton's First Report of Discrimination, Cotton had to take a brief leave of absence due to her father's congestive heart failure.

142. Cotton returned from her leave of absence on or about July 15, 2024.

143. When Cotton returned, Cotton continued to face disparate treatment and discrimination from Ring.

144. On or about July 25, 2024, Cotton reported discrimination. ("Second Report of Discrimination.")

145. Cotton's Second Report of Discrimination was a letter.

146. Cotton sent Cotton's Second Report of Discrimination to Stern.

147. Cotton's Second Report of Discrimination complained about continued discrimination from Ring.

148. Cotton's Second Report of Discrimination renewed her complaints from Cotton's First Report of Discrimination.

149. In response to Cotton's Second Report of Discrimination, Stern instructed Cotton to take some time off until he instructed her to return to work.

150. In response to Cotton's Second Report of Discrimination, Stern told Cotton he would investigate Cotton's Second Report of Discrimination.

151. Cotton attempted to follow up with Stern regarding the investigation Stern promised.

152. Stern replied to Cotton's attempt to follow up stating that he needed additional time.

153. Cotton did not receive any further communication from Stern.

154. On or about August 2, 2024, Carver terminated Cotton's employment.

155. Carver terminated Cotton's employment purportedly for no call no show on August 1 and August 2 2024.

156. Carver's purported reason for Cotton's termination is pretext.

157. Carver's purported reason for Cotton's termination is pretext for discrimination.

158. Carver's purported reason for Cotton's termination is pretext for race discrimination.

159. Carver's purported reason for Cotton's termination is pretext for retaliation.

160. Carver's purported reason for Cotton's termination is pretext for retaliation for Cotton's First Report of Discrimination.

161. Carver's purported reason for Cotton's termination is pretext for retaliation for Cotton's Second Report of Discrimination.

162. Defendants' did not proffer a legitimate non-discriminatory reason for terminating Cotton.

163. Upon information and belief, Cotton's termination of employment, Defendants hired or retained an individual outside of Cotton's protected class to replace Cotton.

164. As a result of Defendant's conduct, Cotton suffered, and will continue to suffer damages.

## COUNT I: <u>RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>

165. Cotton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

166. Throughout her employment, Cotton was fully competent to perform her essential job duties.

167. Carver treated Cotton differently than other similarly situated employees based on her race.

168. On or about August 07, 2024, Carver terminated Cotton without just cause.

169. At all times material herein, similarly situated non-African-American employees were not terminated without just cause.

170. Defendants terminated Cotton based on her race.

171. Cotton suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages.

172. As a direct and proximate result of Defendants' conduct, Cotton has suffered and will continue to suffer damages, including economic and emotional distress damages.

# COUNT II: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

173. Cotton restates each and every prior paragraph of this complaint, as if it were fully restated herein.

174. Pursuant to 42 U.S.C. § 2000e-3(a), it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

175. On or about May 21, 2024, Cotton opposed race discrimination.

176. Immediately after Cotton's first report of discrimination, she was issued a PIP.

177. On or about July 25, 2024, Cotton opposed race discrimination.

178. On or about August 2, 2024, Carver terminated Cotton's employment.

179. Carver issued Cotton a PIP in retaliation for opposing discrimination.

180. Carver terminated Cotton's employment in retaliation for opposing discrimination.

181. As a result of Defendants' retaliation against Cotton in violation of 42 U.S.C. § 2000e-2(a)(1), Cotton has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Cotton to compensatory monetary relief.

182. As a result of Defendant's retaliation against Cotton in violation of 42 U.S.C. § 2000e-2(a)(1), Cotton has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

183. In its discriminatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Cotton, thereby entitling Cotton to an award of punitive damages.

184. To remedy the violations of the rights of Cotton secured by 42 U.S.C. § 2000e-2(a)(1), Cotton requests that the Court award her the relief prayed for below.

## COUNT III: <u>HOSTILE WORK ENVIRONMENT BASED ON RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>

185. Cotton restates every paragraph of this complaint as if fully restated herein.

186. During her employment with Carver, Cotton was subjected to offensive and harassing conduct by Ring based on Cotton's race.

187. Ring's harassment of Cotton was sufficiently severe or pervasive to affect the terms, conditions, or privileges of Cotton's employment with Carver.

188. Ring's conduct had the purpose and/or effect of unreasonably interfering with Cotton's job duties and created an intimidating, hostile, and offensive working environment. See 29 C.F.R. § 1604.11(a)(3).

189. Carver knew or should have known of Ring's harassment of Cotton due to Cotton's reports of discrimination.

190. Carver condoned, tolerated, and ratified Ring's harassment of Cotton.

191. Ring's harassment was offensive to Cotton.

192. Ring's harassment created a work environment that the reasonable person similarly situated to Cotton would find hostile and/or abusive.

193. As a result of Carver allowing a hostile work environment to flourish in violation of Title VII, Cotton has suffered mental anguish and emotional distress, including, but not limited to,

depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

194. In its unlawful actions as alleged above, Carver has acted with malice or reckless indifference to Cotton's rights, thereby entitling Cotton to an award of punitive damages.

195. To remedy the violations of Cotton's Title VII rights, Cotton requests that the Court award her the relief prayed for below.

## DEMAND FOR RELIEF

WHEREFORE, Shaquan Cotton demands from Defendants the following:

(a) Issue an order requiring Carver to restore Cotton to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Cotton for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $ 25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $ 25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Cotton's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ *Evan G. Gungor, Esq.*

Evan Gungor (60902)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
5540 Centerview Drive
Suite 200B
Raleigh, NC 27606
Phone: (980) 332-4688
Fax:    (216) 291-5744
Email: evan.gungor@spitzlawfirm.com

*Attorneys For Plaintiff*
*Shaquan Cotton*

## JURY DEMAND

Plaintiff Shaquan Cotton demands a trial by jury by the maximum number of jurors permitted.

    /s/ *Evan Gungor*
    Evan G. Gungor, Esq. (60902)